UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MWG ENTERPRISES, LLC d/b/a          )
ATLAS HEALTH SERVICES, LLC,         )
                                    )       Civil Action No. 4:19-cv-00424
          Plaintiff,                )
                                    )
v.                                  )       JURY TRIAL DEMANDED
                                    )
ETS WOUND CARE, LLC, and            )
THOMAS E. "TED" DAY,                )
                                    )
          Defendants.               )
                                    )
_____

## COMPLAINT

Plaintiff MWG Enterprises, LLC, d/b/a Atlas Health Services, LLC ("Atlas"), hereby sues

Defendants ETS Wound Care, LLC ("ETS") and Thomas E. "Ted" Day (ETS and Day,

"Defendants") and alleges as follows:

## INTRODUCTION

This is a case about Defendants' repeated improper attempts to cancel their distributor

Atlas's exclusive distribution rights and resell those rights to other distributors who would pay the

company more—while appropriating Atlas's confidential and trade secret information in the

process.  On July 1, 2017, Atlas entered into a perpetual Non-Disclosure Agreement (the "NDA")

with ETS to explore a potential business relationship for Atlas to distribute Mirragen™, an

innovative medical wound care product that had recently been cleared by the FDA for public sale,[1]

_____

[1] < https://www.businesswire.com/news/home/20170403005830/en/ETS-Wound-Care-Gains-FDA-Clearance-MIRRAGEN%E2%84%A2>

1

exclusively into multiple territories.  Just a few weeks later, Atlas and ETS signed a distribution agreement (the "Agreement") granting Atlas the exclusive right to sell Mirragen™.

Atlas specifically bargained with ETS for the exclusive right to sell ETS products, including Mirragen™, in multiple territories.  These territories included the entire federal government—namely, the Veterans Affairs hospitals nationwide (the "VA"), as well as the Indian Health Service ("IHS") and the U.S. Department of Defense ("DOD").  Atlas's territories also included any purchasers in Texas, Oklahoma, Arkansas, Louisiana, Tennessee, and Florida (altogether, the "Exclusive Territories").  When the Agreement was signed, there was only a small undeveloped regional market for Mirragen™.  Accordingly, Atlas and ETS contemplated in the Agreement a multi-year period of time to allow Atlas the opportunity to develop its markets.

ETS significantly hampered Atlas's ability to develop a market for Mirragen™.  Despite promising Atlas to do so, ETS never obtained the billing codes required by federal and private payers for reimbursement.  Without those billing codes, the market for Mirragen™ remained stagnant and small. When ETS failed to act, Atlas developed the market for Mirragen™ by investing its own resources in pursuing a reimbursement code, which ETS demanded Atlas cease, and focusing on the product's development.  Such efforts included investing its own capital and relationships to conduct live tissue testing of Mirragen™ with DOD personnel to determine the optimal sizing, uses and packaging, all to ensure its widespread adoption by the military. The results of these tests and recommendations by Atlas's government contacts, including specifics such as intended uses in the field, and particular sizing requirements for use in the field, were communicated to ETS—under cover of the NDA.

At all relevant times, Atlas met its minimum purchasing requirements for Mirragen™ under the Agreement, despite the harm caused by ETS's failure to procure billing codes to the

development of a market for Mirragen™.  Accordingly, pursuant to the Agreement's provisions, the Agreement automatically extended for another year through July 2019.

On or around July 11, 2018, subject to the confidentiality and other provisions of the NDA, Atlas provided its customer list to ETS.  *Just two days later*, with Atlas's customer list in hand, ETS sent a letter to Atlas claiming that the Agreement had been breached by Atlas and purporting to terminate the Agreement effective July 20, 2018.  It did this, notwithstanding the fact that even if ETS had breached the Agreement (which it has not), ETS lacked the ability under the Agreement to terminate anything other than Atlas's *exclusivity*.  To add salt to the wound, ETS appropriated Atlas's trade secret and protected information, which was shared subject to the provisions of the NDA—including information related to the federal government's sizing and uses of Mirragen™, as well as Atlas's private customer information and strategic contacts within major hospital systems.

ETS's principal, Ted Day, provided Atlas's customer information to other distributors who were then able to identify Atlas's strategic targets, relationships, and decision-makers.  Other distributors turned this information into hundreds of thousands of dollars of sales in Atlas's Exclusive Territories.  Additionally, Ted Day personally interfered with the Agreement, including by calling Atlas's salesforce and instructing them that there was no Agreement, telling the salesforce that their selling Mirragen™ was "illegal," and that they would face repercussions if they continued to sell for Atlas.

To cap it off, now that ETS (incorrectly) claims that the Agreement has terminated and Atlas can no longer sell its products, it refuses to repurchase any products that Atlas is supposedly barred from selling.  ETS cannot have it both ways.

*Therefore*, Plaintiff brings this action to declare the Agreement valid and enforceable; to seek damages for the breach of the Agreement, including the breach of the implied duty of good faith and fair dealing; to seek damages and injunctive relief, including without limitation, cessation of any ETS use of Atlas's customer list and the return of all Atlas confidential information for violating the NDA and the theft of Atlas's trade secrets and tortious interference; to seek recoupment for its lost ability to sell its inventory; and to seek other relief to which it is entitled.

## PARTIES

1.      Plaintiff Atlas is a limited liability company organized and existing under the laws of the State of Texas.  Its principal place of business is at 1000 Weatherford Dr., Ft. Worth, Texas 76102.

2.      Defendant ETS is a limited liability company organized and existing under the laws of the State of Missouri.  Upon information and belief, its principal place of business is 4030 HyPoint North, Rolla, Missouri 65401.  Upon information and belief, ETS's sole owner/member is Defendant Thomas E. "Ted" Day and Day is a resident of Missouri.

3.      Defendant Thomas E. "Ted" Day is an individual who, on information and belief, is a citizen of the state of Missouri.

## JURISDICTION AND VENUE

4.      Subject matter jurisdiction is appropriate under 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331, because one or more claims encompass the federal Defend Trade Secrets Act, and all other claims fall under the court's ancillary jurisdiction, 28 U.S.C. § 1367.

5.      Subject matter jurisdiction is also proper under 28 U.S.C. § 1332 because the Plaintiff is a citizen of a different state than every Defendant and the amount in controversy exceeds $75,000.

4

6.     The court has general jurisdiction over the Defendants because each Defendant is a citizen of the State of Missouri.  Additionally, Defendant ETS consented to this Court's jurisdiction to resolve the issues alleged herein.

7.     Venue is proper in the Eastern District of Missouri under 28 U.S.C. § 1391(b) because one or both Defendants reside in the District and a substantial number of the acts giving rise to this action occurred within the District.

8.     Venue also is proper in this Division because one or more Defendants reside in Phelps County, Missouri, which is located in the Eastern Division of the Eastern District of Missouri.

## FACTUAL BACKGROUND

### A.  The Atlas-ETS Non-Disclosure Agreement

9.     On June 12, 2017 (the "NDA Effective Date"), ETS and Atlas signed a mutual non-disclosure agreement (the "NDA") in order to evaluate product and pursue a potential business relationship (*See* Exhibit 1).

10.     The NDA provides that "Confidential Information" means "any and all technical and non-technical information disclosed by [a] Party" to the other Party and may include, "**without limitation**: . . . **trade secrets**, [] **proprietary and confidential information**, ideas, techniques, . . . know-how, processes . . . related to current, future, and proposed products and services of each of the Parties, such as information concerning **research**, experimental work, **development**, design details and specifications . . . procurement requirements, purchasing, manufacturing, **customer lists**, . . . **business and contractual relationships** . . . and [] all other information that the Receiving Party knew, or reasonably should have known, was the Confidential Information of the Disclosing Party."  Ex. A, NDA § 1 (emphasis added).

5

11.     The NDA provides that "Confidential Information is and shall remain the sole property of the Disclosing Party. . . . Neither Receiving Party will make, have made, use or sell for any purpose any product or other items using, incorporating or derived from any Confidential Information of the Disclosing Party."  NDA § 7.

12.     The NDA will not terminate until "five (5) years(s) after" the NDA Effective Date, or June 12, 2022.  NDA § 9.  The NDA has been in effect at all times relevant to this action.

13.     Missouri law governs the NDA.  NDA § 11.

**B.  The Atlas-ETS Distributorship Agreement**

14.     Approximately three weeks after signing the NDA, on July 1, 2017, ETS and Atlas entered into an exclusive distribution agreement (the "Agreement") (*see* Exhibit 2).

15.     In the Agreement, ETS granted Atlas the exclusive right to sell its products in certain territories identified in Exhibit A to the Agreement.

16.     Those territories include all sales to United States federal government facilities in all fifty states and foreign countries, as well as any sales to any entities in Texas, Louisiana, Oklahoma, Tennessee, and Florida.  *See* Ex. B, Agreement Ex. A (the "Exclusive Territories").

17.     The Agreement provides Atlas with the right to sell ETS's products until the Agreement is terminated.

18.     Atlas negotiated for these exclusive distribution opportunities.  As consideration for Atlas purchasing minimum amounts of product from ETS each year during the term of the Agreement ("Minimum Purchases"), Atlas received exclusive selling rights in its territories.

19.     The Agreement incorporates the terms of the NDA.  *See* Agreement § 6.

20.     The principal product at issue under the Agreement is Mirragen™, an innovative biologic wound-care product cleared for public sale by the United States Food and Drug Administration.

21.     When ETS and Atlas signed the Agreement, Mirragen™ did not yet have a "current procedural terminology" ("CPT") code or a "healthcare common procedure coding system" ("HCPCS") code (together, the "billing codes").

22.     CPT and HCPCS codes are a vital part of the medical coding and insurance reimbursement process.  These codes are essential for selling the product to private hospitals and medical practices. Without them, insurers generally will not pay for the product.

23.     During negotiations with Atlas, ETS represented on multiple occasions that it would obtain the product-specific CPT and HCPCS Codes for Mirragen™.

24.     Atlas relied on those representations, which turned out to be false, when it entered into the Agreement.

25.     The Agreement required Atlas to make specified minimum purchases annually.  As set forth in Exhibit C to the Agreement, Atlas had to satisfy "MIRRAGEN[™] Minimum Sales" which are defined to be **"product purchased from ETS Wound Care**."  Ex. B, Agreement Ex. C.

26.     The Agreement required Atlas to make an initial "stocking" purchase order. Agreement § 7.2.  Atlas made this purchase.

27.     The Agreement required Atlas to "maintain the level of Product inventory throughout the term of th[e] Agreement" equivalent to the initial "stocking" purchase order. Agreement § 7.2.  Accordingly, the Agreement contemplated that Atlas would maintain, store, and "warehouse" product regardless of whether sales for that product existed.

7

28.     The Agreement required Atlas to make minimum purchases from ETS Wound Care during the 2017-2018 term.  The Agreement also identified minimum purchase requirements for subsequent terms in 2018.  Ex. B, Agreement Ex. C.

29.     Even though without the billing codes there is no private market for Mirragen™, Atlas satisfied the prescribed Minimum Purchases required by the Agreement for the 2017-2018 term year.

30.     During the "Pre-Reimbursement Code Period," which is the period of time before the billing codes are obtained, the Agreement provides that "if the minimum Annual Sales Metrics for year one (1) are reached [as] defined in Exhibit C, the Term is extended for an additional (1) year of exclusive distribution."  Agreement § 8.2.

31.     Atlas satisfied the Agreement's required sales metrics for the 2017-2018 Term and the Agreement was automatically extended for another (1) year of exclusive distribution.

32.     ETS passed title to purchased Mirragen™ to Atlas "when Products [were] delivered to the carrier at [ETS]'s warehouse for shipment."  Agreement § 7.13.

**C.  ETS Uses Atlas's Confidential Information and Obtains its Proprietary Customer Lists**

33.     Atlas funded research that enabled Atlas and ETS to prove that Mirragen™ was an effective coagulator.  Atlas expended time, relationships, energy and resources to conduct animal testing and deployment of the product on a test-basis on live tissue.

34.     The results of all such tests are Atlas's exclusive property information under the Agreement and the NDA.  The research included work with the DOD, which also included data on optimal sizing and packaging for deployment in the field.

35.     ETS used Atlas's proprietary information to create its products, including those that Atlas had the right to sell to the Federal Government under its exclusive rights.

8

36.     Despite granting Atlas exclusive distribution rights in the Exclusive Territories, ETS and Defendant Day began to seek Atlas's proprietary customer list.   In approximately December 2017, Defendant Day and Chad Lewis, then President and CEO of Defendant ETS, requested from Atlas a list of all Atlas's sales representatives, contacts, potential contacts and current customers purchasing Mirragen™ ("Atlas's Customer List").

37.     Atlas's Customer List is Atlas's property and a trade secret that Atlas shared with ETS subject to the terms of the NDA.

38.     In December 2017, Atlas, via an in-person meeting, provided ETS with Atlas's Customer List.

39.     On July 11, 2018 Atlas, via email, again provided ETS with Atlas's Customer List.

**D.   ETS's Wrongful Purported Termination of the Agreement**

40.     On July 13, 2018, just two days after Atlas provided ETS with an updated Atlas Customer List, and while the Agreement was in full force and effect, Chad Lewis, on behalf of ETS, purported to terminate the Agreement via letter.  *See* Exhibit C (the "Purported Termination Letter").

41.     Even though Atlas made the Minimum Purchases required by the Agreement, the Purported Termination Letter claimed that Atlas had not worked "vigorously, aggressively and compliantly."  *See* Ex. C at 2.

42.     The Purported Termination Letter claimed that ETS had a "belief" that product purchased by Atlas had been "warehoused" on the grounds that Atlas had purportedly not satisfied the required purchase metrics.

43.     ETS had no grounds to terminate the Agreement at the time it sent the Purported Termination Letter and has had no such grounds at any time thereafter.  The provisions for

termination of this Agreement related to the Minimum Purchases requirements are found in Sections 1.3 and 7.1 but only grant ETS the right to terminate Atlas's *exclusive* distribution rights. Section 1.3 states that "in the event [Atlas] fails to meet a minimum Annual Sales Metric specific in Exhibit C and this Agreement is not terminated pursuant to Section 9, [ETS] shall be entitled to, upon notice to [Atlas], *amend or terminate [Atlas]s exclusivity* to sell or offer for sale the Products in the Territory in which [Atlas] failed to meet the Annual Sales Metrics."

44.    While Section 1.3 references termination under Section 9 of the Agreement, Section 9 has no termination provision.

45.    Section 7.1 provides the only other covenant that grants ETS the right to terminate the agreement if Minimum Purchases are not met.  It states that Atlas "*will purchase at least the minimum number of Products* specified in Exhibit C during the term of this Agreement."  Further, if Atlas "*fails to purchase* its Minimum Purchase Requirements . . . in two successive half-terms of this Agreement, [ETS] will have the right, at its option, to terminate this Agreement."

46.    Under the Agreement, the Annual Sales Metrics and Minimum Purchase requirements were identical and were keyed to Atlas's *purchases* of Mirragen™ from ETS, not any supposed sales to end users or customers as ETS claimed in its July 13, 2018 letter.

47.    Therefore, under no provision of the Agreement is ETS permitted to terminate the Agreement or even Atlas's exclusivity rights when Atlas had purchased the minimum required amount from ETS.

48.    Moreover, the general termination clause at Section 8.4 is applicable only if a party is in "material breach of this Agreement and either the breach cannot be cured, or if the breach can be cured, it is not cured within 60 days following the other Party's receipt of notice of such breach."

10

49.     Atlas never failed to meet its Minimum Purchases nor was it otherwise in material breach of the Agreement.  Atlas met its minimums for the first year and could have cured any claimed breach identified by ETS.

50.     ETS never explained why any claimed "material breach" could not be cured and ETS did not afford Atlas a 60-day opportunity to cure same.  Instead, after sending the Purported Termination Letter, ETS attempted to renegotiate the Agreement with ETS.  When renegotiations broke down, ETS claimed the Agreement had been terminated due to Atlas's alleged breaches.

51.     Generally, Atlas placed orders, those orders were fulfilled by ETS, and ETS cashed Atlas's checks. This occurred even after ETS claimed the Agreement had terminated.

52.     Atlas's final order, although timely placed with an email acknowledgment of receipt, was not fulfilled by ETS.  After failing to fulfill an order, ETS cannot then claim that *Atlas* failed to meet its Minimum Purchase requirements when ETS is the one who refused to honor the acknowledged request.

53.     Even if the Minimum Purchases had not been met, it was because ETS interfered.  ETS's interference constitutes a waiver of the condition precedent to extend the period of exclusivity by another year.

54.     Even if the Agreement had terminated or expired (which it has not), Section 8.6 of the Agreement contemplates that Atlas would return purchased products (transfer of which had already passed to Atlas) to ETS, or destroy them.  ETS refuses to accept return of the purchased products or compensate Atlas for the products' return.

**E.  Use of Atlas's Proprietary Data and Trade Secrets**

55.     At all relevant times, the NDA was and remains in full force and effect.

11

56.     ETS did not, and did not have grounds to, terminate the Agreement.  Section 6 of the Agreement incorporated the terms of the NDA.

57.     During the term of the Agreement, upon information and belief, ETS used Atlas's confidential information and hired competing distributors to work within Atlas's Exclusive Territories.

58.     This confidential information included the Atlas-funded research with the DOD and the resulting feedback, data and specifications related to use of Mirragen™ by the DOD in the field.  All of this information was protected trade secret information developed by Atlas and shared with ETS subject to the terms of the NDA.  ETS then appropriated the information and used it to create special products for the DOD which, upon information and belief, ETS continues to sell to the DOD, if not others, both directly and through its new distributors.

59.     The NDA also specifically covers "customer lists" and "business and contractual relationships" – i.e., Atlas's Customer List and business and contractual relationships.

60.     The Atlas Customer List is by its very nature confidential information, a trade secret, and is protected from disclosure by the NDA and the Agreement. The List was created as a result of the combined decades of know-how and experience of Atlas's employees and millions of dollars in investment by Atlas, and it represented a critical economic and strategic advantage to Atlas.

61.     The NDA requires that Atlas's trade secrets, including the DOD data and Atlas's Customer List data, must be returned to Atlas and cannot be used by ETS.

62.     Specifically, Section 6 and 7 of the NDA provide that:

> **6.**     Upon termination or expiration of this Agreement, or upon written request of either Party, each Party will promptly return to the Disclosing Party or destroy all documents and other tangible materials representing the Disclosing Party's Confidential Information and all copies thereof.
>
> **7.**     Confidential Information is and shall remain the sole property of the Disclosing Party. The Receiving Party recognizes and agrees that nothing contained in this Agreement will be construed as granting any property rights, by license or otherwise, to any Confidential Information of the Disclosing Party, or to any invention or any patent, copyright, trademark, or other intellectual property right that has issued or that may issue, based on such Confidential Information. Neither Receiving Party will make, have made, use or sell for any purpose any product or other item using, incorporating or derived from any Confidential Information of the Disclosing Party. Neither this Agreement nor the disclosure of any Confidential Information hereunder shall result in any obligation on the part of either Party to enter into any further agreement with the other, license any products or services to the other, or to require either Party to disclose any particular Confidential Information. Nothing in this Agreement creates or shall be deemed to create any employment, joint venture, or agency between the Parties.

63.     The NDA prohibits ETS from making use of the information it received from Atlas, not even to sell a product "incorporating or derived from" the information Atlas provided to it. Therefore, all sales to the DOD or other government agency or private purchaser that reflect or are derived from the information Atlas provided ETS based on its research into the coagulant effects of the product are in violation of the NDA and, by extension, of the Agreement.

64.     The confidentiality provisions of the Agreement remain in effect because Section 8.10 of the Agreement states that "Notwithstanding the expiration or termination of this Agreement, the provisions of Sections . . . 6 . . . shall remain in full force and effect." *See* Agreement 8.10.

65.     Despite its confidential nature, upon information and belief, in the summer of 2018 Ted Day began using Atlas's Customer List, which Atlas shared subject to the NDA on or about July 11, 2018, two days before ETS purported to terminate the Agreement, to contact customers and potential customers within Atlas's Exclusive Territories and inform them that Atlas did not have distribution rights to sell Mirragen™.

13

66.     This subversive damaging activity is apparently ongoing. Upon information and belief, on January 16, 2019, Ted Day sent an email to an Atlas distributor, threatening them with litigation should they continue to sell Mirragen™ for Atlas.

67.     Upon information and belief, Mr. Day also contacted physicians and hospital systems in Oklahoma and Texas to inform them that ETS will not be honoring Atlas's Agreement and that it is "illegal" for Atlas to sell Mirragen™.

68.     Upon information and belief Mr. Day, using Atlas's Customer List, then directed current and potential Mirragen™ customers within Atlas's Exclusive Territories to Mr. Lewis Hall and his company, Genetic Medication Management, LLC ("GMM"), as ETS' Mirragen™ distributor in Atlas's Exclusive Territories.

69.     Upon information and belief, Ted Day, using the Customer List, also directed current and potential Mirragen™ customers within Atlas's Exclusive Territories to Affirmative Solutions, LLC ("Affirmative Solutions"), as ETS's Mirragen™ distributor in Atlas's U.S federal government territories including VA hospitals, the DOD and IHS hospitals.

70.     Upon information and belief, since July 2018, Lewis Hall has been using Atlas's Customer List to contact Atlas's current and potential customers within Atlas's Exclusive Territories in order to lure these customers into purchasing Mirragen™ from him and his company GMM, which employs Mr. Hall's sales representatives who are actively selling Mirragen™, rather than purchasing from Atlas directly.

71.     ETS has also undercut Atlas's pricing schedule with the U.S. federal government, over which Atlas has exclusive distribution rights to sell Mirragen™ as set forth in Exhibit A of the Agreement.

14

72.     Without informing Atlas, ETS submitted a price for Mirragen™ to the Federal Supply Schedule ("FSS") (the price on this schedule represents the base price at which a product can be sold to the federal government) that is below the price for Mirragen™ negotiated between ETS and Atlas and reflected in the Agreement.

73.     ETS has now hired Affirmative Solutions to sell Mirragen™ to US federal government facilities at this lower price and ETS has informed VA hospitals that Atlas is illegally selling Mirragen™ at a higher price than ETS' new distributors are currently charging for the same product.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Declaratory Relief**
**(against all Defendants)**

74.     Atlas incorporates the foregoing factual allegations as if fully set forth herein.

75.     Atlas asks this Court, under Mo. Rev. Stat. § 527.010 et seq. and under 28 U.S.C. §§ 2201-2202, to declare that the Agreement and NDA have been and remain in full force and effect since their respective execution dates.

76.     Plaintiff asks this Court to issue all further or equitable relief consistent with this declaration, including injunctive relief and orders of restitution, disgorgement and/or constructive trust that is appropriate following the declaration that the Agreement and NDA are in full force and effect on behalf of Atlas.

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(Against ETS)**

77.     Plaintiff incorporates the foregoing factual allegations as if fully set forth herein.

78.     The Agreement is a valid contract between Atlas and ETS and has been since its execution on July 1, 2017.

79.     ETS wrongfully terminated the Agreement and did not afford Atlas a chance to cure any purported default, return the product it had purchased, or recoup its nearly $2 million investment in Mirragen™.

80.     The Agreement has a one (1)-year term that extends for an additional (1) year upon reaching the minimum Annual Sales Metrics for year one (1). *See* Agreement at § 8.1. Therefore, under Missouri law, ETS cannot simply terminate the Agreement because Atlas reached its minimum Annual Sales Metric for year one.

81.     ETS breached the Agreement by terminating it despite no applicable termination provision.

82.     ETS and Ted Day's granting other distributors rights to sell Mirragen™ within Atlas's Exclusive Territories amounts to a breach of contract in violation of Section 1.1 in Exhibit 2, as set forth above.

83.     ETS's use of the Atlas Customer List is a violation of the Agreement, Section 6, as it incorporated the NDA.

84.     ETS's breaches of contracts are material and tend to deprive Atlas of the benefits of its bargain.

85.     The Agreement imposes an implied duty of good faith and fair dealing, the breach of which is tantamount to a breach of the contract itself.

16

86.    ETS breached this duty.

87.    ETS breached the Agreement by allowing Atlas to invest its own money into proving the efficacy of Mirragen™, allowing Atlas to purchase millions of dollars' worth of product, and then purporting to cancel Atlas's rights to sell the product, including the inventory it already, purchased, paid for, and to which title had passed to Atlas.

88.    ETS did so without allowing Atlas the opportunity to sell to its own customers, all the while embarking on a mission to steal Atlas's customers, defaming Atlas in the process, and otherwise preventing Plaintiff from realizing the benefit of its economic investment in Mirragen™.

89.    ETS's breaches of contract caused Atlas damages in the form of loss of its out-of-pocket investment, and the loss of the value of the benefit of the Agreement.

90.    Section 15.8 of the Agreement provides that the prevailing party in any action commenced "to enforce any of the terms" of the Agreement or "because of the breach … of any of the terms" of the Agreement "shall be entitled to … all actual out-of-pocket costs and expenses incurred by such prevailing Party in connection with such action and the enforcement and collection of any judgment rendered therein including, without limitation, all reasonable attorneys' fees."

91.    Atlas is thus entitled to damages, including its reasonable attorneys' fees incurred in connection with this action, including all out-of-pocket costs and expenses.

### THIRD CAUSE OF ACTION
**Breach of Contract**
**(Against ETS)**

92.    Atlas incorporates the foregoing factual allegations as if fully set forth herein.

93.    The NDA is a valid contract between Atlas and ETS and has been since its execution.

17

94.    Under the terms of the NDA, the parties agreed to treat all confidential information confidential.

95.    Section 7 of the NDA provides that all protected confidential information given by Atlas to ETS would remain the exclusive property of Atlas, irrespective of its communication during the period under the NDA. It further provides that ETS would not make use of Atlas's confidential information, or sell any product "using, incorporating, or derived from" Atlas's information.

96.    Despite this provision explicitly regarding the treatment and use of confidential information, ETS used Atlas's confidential information to sell its products and thereby breached the NDA.

97.    Section 12 of the NDA specifically authorizes a court to issue an injunction prohibiting the breach of the NDA's terms and conditions:

> **12.**    Each Party acknowledges that its breach of this Agreement may cause irreparable damage to the other Party for which recovery of damages would be inadequate, and hereby agrees that the other Party will be entitled to seek injunctive relief under this Agreement, as well as such further relief as may be granted by a court of competent jurisdiction.

98.    The NDA was incorporated into the Agreement under §6 of the Agreement.

99.    Plaintiff's research with the DOD required (1) investment of confidential and proprietary contacts and know-how for working with the federal government, especially the DOD, as well as (2) the expenditure of significant financial and other resources to conduct the live tissue testing and to obtain feedback on the efficacy of Mirragen™, to determine the optimal sizing and packaging for deployment in the field via the "Go Pacs," and to obtain the requisite approvals from proper channels in the government.

100.    Atlas's trade secret confidential Customer List represented years of trial and error, relationships, and investment, and was therefore a highly valuable piece of Atlas's strategic advantage.

101.    The work that Atlas performed with the DOD and the resulting data and information are all protected information under the NDA that belongs to Atlas. The information is not available from other sources and is not publicly known.

102.    The information was developed pursuant to years of relationships and know-how, as well as the expenditure of substantial resources to develop same, and to conduct the testing described herein.

103.    ETS and Ted Day have wrongfully taken the results and benefit of this investment which belongs to Atlas, in violation of the NDA.

104.    ETS and Ted Day used Atlas's confidential and trade secret information to create a product or set of products that are derived from the information provided to ETS, and used that information to sell such products. ETS continues to sell such products, or offer them for sale, in violation of the NDA and Atlas's trade secret rights.

105.    The Atlas Customer List is protected information that belongs to Atlas. The list is not available from other sources and it is not publicly known. Rather, the list was developed over years of personal connections between Atlas's employees and various individuals at facilities throughout Atlas's Exclusive Territories as a result of meticulously fostered personal relationships.

106.    ETS obtained the Customer List subject to the provisions of the NDA. The List was marked "confidential."

107.    Upon information and belief, in violation of the NDA and Agreement, ETS and TED Day contacted specific persons and entities on Atlas's Customer List, known only to Atlas,

and directed them away from doing business with Atlas to purchase Mirragen™ through Lewis Hall, GMM and Affirmative Solutions, among others.

108.    Thus, upon information and belief, ETS provided the list to others and wrongfully published its contents.

109.    ETS wrongfully used the Customer List to defame and smear Atlas, thus diluting and diminishing the value of the List to Atlas. To wit, Ted Day, Lewis Hall, GMM and Affirmative Solutions' soliciting customers in Atlas's Exclusive Territories away from Atlas and/or creating the circumstances wherein those customers would stop doing business with Atlas amounts to a theft of trade secrets under both federal and state law.

110.    Ted Day's violation of the terms of the NDA and misappropriation of Atlas's Customer List is demonstrated by Atlas's receipt of multiple emails and phone calls from customers and potential customers within the VA, IHS, and non-governmental hospitals stating that they would no longer be pursuing a contract with Atlas or entertaining sales calls with Atlas representatives because ETS had informed them that Atlas was no longer a licensed distributor of Mirragen™.

111.    Defendants obtained a highly valuable "head start" in the development of a customer base for Mirragen™ within Atlas's Exclusive Territories, which they would not have had but for their breaches of the NDA.

112.    The "head start" advantage obtained by Defendants is worth millions of dollars in sales that rightly belong to Atlas.

113.    As a result of ETS's breaches of the NDA, Atlas has suffered injury and damages, and the threat of continued injury is ongoing.

114. Atlas is entitled to damages, injunctive relief and its reasonable attorneys' fees incurred in connection with this action, including all out-of-pocket costs and expenses.

**FOURTH CAUSE OF ACTION**
**Recoupment**
**(Against ETS)**

115. ETS induced Atlas into investing millions of dollars into inventory, sales, development, research and marketing, as well as into labor costs associated with each of the foregoing.

116. Atlas has not been able to reap even a nominal profit from its investment, let alone enough to recoup its lost investment.

117. Atlas stands to lose millions of dollars on its investment.

118. Already, ETS has allowed others to sell at least $200,000 in product to the VA—sales which properly belonged to Atlas under its exclusive distribution Agreement—and would have belonged to Atlas.

119. ETS's refusal to allow Atlas to sell product has caused ETS to lose approximately $200,000 worth of inventory due to the expiration of its shelf life. Atlas's initial Mirragen™ purchase order only had FDA approval for a two-year shelf life. Although ETS subsequently obtained FDA approval for a five-year shelf life for Mirragen™ and promised to send Atlas manufacturer expiration date stickers reflecting the extended shelf life to place on Atlas's initial order, ETS did not send the updated expiration date stickers.

120. Upon information and belief, ETS has been selling to the DOD, without paying Atlas for the right to do so, and without reimbursing and paying Atlas for its investment into the research and development of proving that Mirragen™ is an effective coagulant, or for determining the optimal sizing requirements and other criteria for military deployment in the field.

21

121.    ETS's abrupt termination and breach of the Agreement and its breach of the NDA has thus cost Atlas millions of dollars that it is entitled to recoup.

122.    Atlas is thus entitled to damages and its reasonable attorneys' fees incurred in connection with this action, including all out-of-pocket costs and expenses.

### FIFTH CAUSE OF ACTION
### Theft of Trade Secrets under Federal Law
### (Against ETS and Ted Day)

123.    Plaintiff incorporates the foregoing factual allegations as if fully set forth herein.

124.    Plaintiff seeks trade secret protection under the Defend Trade Secrets Act, 18 USC § 1836 et seq.

125.    Both the DOD data and information obtained through Atlas's self-funded research and Atlas's Customer List qualify as trade secrets under federal law.

126.    Atlas and ETS entered into an NDA on June 12, 2017, which was incorporated into the Agreement per Section 6.1.

127.    Pursuant to the terms of the NDA, the parties agreed to treat all confidential information confidential, including Atlas's Customer List, which was provided to ETS and marked "confidential".

128.    Section 12 of the NDA specifically authorizes a court to issue an injunction prohibiting the breach of the NDA's terms and conditions:

> **12.**    Each Party acknowledges that its breach of this Agreement may cause irreparable damage to the other Party for which recovery of damages would be inadequate, and hereby agrees that the other Party will be entitled to seek injunctive relief under this Agreement, as well as such further relief as may be granted by a court of competent jurisdiction.

129.    The NDA was incorporated into the Agreement under Section 6.1 thereof.

130.     Atlas's research with the DOD required investment of confidential and proprietary contacts and know-how for working with the federal government, especially with the DOD, as well as the expenditure of significant resources to conduct the live tissue testing and obtain feedback on the efficacy of Mirragen™, to determine the optimal sizing and packaging for deployment in the field, and to obtain the requisite approvals from proper channels in the government.

131.     Atlas's trade secret confidential Customer List represented years of trial and error, relationships, and investment, and was therefore a highly valuable piece of Atlas's strategic advantage.

132.     The work that Atlas performed with the DOD and the resulting data and information are all trade secrets that belong to Atlas. The information is not available from other sources and is not publicly known. The information was developed pursuant to years of relationships and know-how, as well as the expenditure of substantial resources to develop the same, and to conduct the tissue testing.

133.     ETS has wrongfully taken the results and benefit of this investment, which belongs to Atlas, thus committing a theft of trade secrets under federal law.

134.     ETS used the information to create a product or set of products that are derived from the information provided to ETS, and to sell those products. ETS continues to sell such products, or offer them for sale, in violation of the Agreement, NDA and Atlas's trade secret rights.

135.     The Atlas Customer List is also a trade secret. The list is not available from other sources and it is not publicly known. Rather, the List was developed over years of personal connections between Atlas's employees and various individuals at facilities throughout Atlas's Exclusive Territories as a result of meticulously fostered personal relationships.

23

136.    ETS obtained the List subject to the provisions of the NDA. The List was marked "confidential."

137.    Upon information and belief, in violation of the NDA and Agreement, ETS and Ted Day contacted specific persons and entities on Atlas's Customer List, known only to Atlas, and directed them away from doing business with Atlas to purchase Mirragen™ through Lewis Hall, GMM and Affirmative Solutions, among others.

138.    Thus, upon information and belief, ETS provided the List to others and wrongfully published its contents.

139.    ETS wrongfully used the Customer List to defame and smear Atlas, thus diluting and diminishing the value of the Customer List to Atlas.  To wit, Ted Day, Lewis Hall, GMM and Affirmative Solutions' soliciting customers in Atlas's Exclusive Territories away from Atlas and/or creating the circumstances wherein those customers would stop doing business with Atlas amounts to a theft of trade secrets under both federal and state law.

140.    Ted Day's violation of the terms of the NDA and misappropriation of Atlas's Customer List is demonstrated by Atlas's receipt of multiple emails and phone calls from customers and potential customers within the VA, IHS, and non-governmental hospitals stating that they would no longer be pursuing a contract with Atlas or entertaining sales calls with Atlas representatives because ETS had informed them that Atlas was no longer a licensed distributor of Mirragen™.

141.    Atlas has suffered injury and damages from lost business due to these actions and the threat of continued injury is ongoing.

142.    Defendants ETS's and Ted Day's misappropriation of Atlas's trade secrets was willful and malicious in that each defendant was aware of the provisions of the NDA, and was

24

aware that Atlas provided its Customer List and research information subject to the provisions of the NDA, but each defendant nonetheless used the confidential information to its or his economic advantage and to the detriment of Atlas.

143.    Atlas is entitled to damages for the actual loss caused by the misappropriation of its trade secrets and damages for any unjust enrichment caused by the misappropriation, exemplary damages in the amount of two times the actual damages awarded, injunctive relief, and its reasonable attorney's fees.

SIXTH CAUSE OF ACTION
**Theft of Trade Secrets Under Missouri Law
(Against ETS and Ted Day)**

144.    Atlas incorporates the foregoing factual allegations as if fully set forth herein.

145.    Atlas is entitled to trade secret protection under § 417.453 *et seq.*, RSMo.

146.    Plaintiff's trade secret confidential Customer List represented years of trial and error, relationships, and investment, and was therefore a highly valuable piece of Plaintiff's strategic advantage.

147.    The work that Atlas performed with the DOD and the resulting data and information are all trade secrets that belong to Atlas. The information is not available from other sources and is not publicly known. The information was developed pursuant to years of relationships and know-how, as well as the expenditure of substantial resources to develop the same, and to conduct the tissue testing.

148.    ETS misappropriated Atlas's trade secrets—both Atlas's Customer List and the work, data, and information stemming from Atlas's engagement with DOD.

149.    Defendants ETS's and Ted Day's misappropriation of Atlas's trade secrets was outrageous because of their evil motive or reckless indifference to others in that each defendant

25

was aware of the provisions of the NDA, and was aware that Atlas provided its Customer List and research information subject to the provisions of the NDA, but each defendant nonetheless used the confidential information to its or his economic advantage and to the detriment of Atlas.

150.   As a result of ETS's actions, Atlas has suffered damages.

151.   Atlas is entitled to damages for the actual loss caused by the misappropriation of its trade secrets and damages for any unjust enrichment caused by the misappropriation, punitive damages, injunctive relief, and its reasonable attorney's fees.

### SEVENTH CAUSE OF ACTION
### Tortious Interference
### (Against ETS and Ted Day)

152.   Plaintiff incorporates all prior factual allegations as if fully set forth herein.

153.   The Agreement with ETS gave Atlas an expectation of future business with customers, including the federal government, and with private providers within Atlas's Exclusive Territories, as is reflected by the locations of Atlas's contacts and customers contained in the Atlas customer listed shared with ETS on July 11, 2018.

154.   ETS intentionally interfered with Atlas's business relationships and with Atlas's expectation that it could sell the products to the federal government's VA hospitals, IHS hospitals, and to various departments within the DOD, as well as to private providers within its Exclusive Territories.

155.   Atlas was making conference calls and sales visits with numerous hospitals and providers throughout its territories for the express purpose of selling Mirragen™, but once these facilities received communications from ETS and Ted Day stating that Atlas no longer had a valid contract to sell Mirragen™ or that ATLAS's selling of Mirragen™ was "illegal," these providers

terminated any future sales meetings with Atlas as well as any future Mirragen™ orders from Atlas.

156.    Defendants knew of Atlas's business expectancy in that (a) defendant ETS was party to the Agreement and (b) ETS made numerous requests for Atlas's customer list and, after repeated demands, was given the Atlas Customer List.  ETS has begun systematically contacting most of the individuals and entities on that list.

157.    On information and belief, Lewis Hall and GMM, at the direction of defendants ETS and/or Ted Day or based on the disclosure by defendants ETS and/or Ted Day, have begun selling directly to entities on that list.

158.    Further, upon information and belief, ETS made the new distributors, like Lewis Hall and GMM, aware of the Agreement.  Lewis Hall, for example, admitted to his knowledge of the Agreement during a deposition taken in connection with a separate litigation.

159.    Also as admitted by Lewis Hall during separate deposition, Lewis Hall and GMM have since July 2018 made Mirragen™ sales totaling over $100,000 to VA hospitals, which are in Atlas's Exclusive Territories.

160.    Defendant Ted Day has further interfered with Atlas's valid business expectancy by threatening Atlas's sales representatives with legal action if they continued to sell Mirragen™ on behalf of Atlas.  Atlas has subsequently lost sales representatives because of Ted Day's actions. Without sales representatives, Atlas cannot continue its business.

161.    No justification exists for either Defendant's interference with Atlas's business expectancy.

162.    ETS had no legal right to declare the Agreement void, and its use of Atlas's confidential and proprietary information was in breach of the NDA.

27

163.    Further, Section 9 of the NDA states that the confidentiality provisions of the NDA remain in full force and effect notwithstanding termination of the NDA. Thus, ETS's and/or Ted Day's use and sharing of Atlas's Customer Lists were legally improper and unjustified.

164.    These acts by ETS and Ted Day are independently wrongful and directly led to Atlas's loss of its customer business and put it in jeopardy of losing future business.

165.    ETS and Day's conduct caused Atlas substantial damages, which Atlas is entitled to recover along with punitive damages and its reasonable attorney's fees.

## JURY DEMAND AND PRAYER

WHEREFORE, Plaintiff Atlas demands trial by jury on all issues triable to a jury in law or in equity, and prays that judgment be entered in its favor and against Defendants ETS and Ted Day, awarding Plaintiff Atlas:

a.    Actual damages in an amount determined at trial;

b.    Punitive or exemplary damages in an amount determined at trial;

c.    Recoupment of out of pocket losses of no less than $2 million;

d.    Its reasonable attorney's fees, including all actual out-of-pocket costs and expenses;

e.    Declaratory relief;

f.    Injunctive relief prohibiting further violation of Plaintiff's trade secrets;

g.    Injunctive relief as to Plaintiff's rights under the Agreement and NDA;

h.    Such other and further relief as the Court deems just and proper.

Dated:  March 8, 2019                    Respectfully submitted,

**DOWD BENNETT LLP**

*/s/Edward L. Dowd, Jr                        .*
Edward L. Dowd, Jr., #28785MO
edowd@dowdbennett.com
Elizabeth C. Carver, #34328MO
ecarver@dowdbennett.com
Philip A. Cantwell, #65505MO
pcantwell@dowdbennett.com
7733 Forsyth Blvd., Suite 1900
St. Louis, MO  63105
Tel: (314) 889-7300
Fax: (314) 863-2111

*Attorneys for Plaintiff*