UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MWG ENTERPRISES, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.                                    ) | Cause No. 4:19-cv-00424-SEP |
| ) | |
| ETS WOUND CARE, LLC, et al.,    ) | |
| ) | |
| Defendants.                    ) | |

MEMORANDUM AND ORDER

Before the Court are Defendants' Motion for Summary Judgment on all Counts Raised by Plaintiff and Counts I and III of Defendants' Amended Counterclaims, Doc. [63], and Plaintiff's Motion for Leave to File a Sur Reply, Doc. [82].  For the reasons set forth below, the Motion for Summary Judgment is granted in part and the Motion for Leave to File a Sur Reply is denied.

FACTUAL BACKGROUND[1]

This lawsuit arises out of a contract between Plaintiff MWG Enterprises, LLC, d/b/a Atlas Health Services, LLC, and Defendants ETS Wound Care, LLC, and Kimberly Day[2] relating to Mirragen, a medical device made of bioabsorbable borate-based glass fibers and particles, which enable it to absorb fluid from wound sites and facilitate healing.  Docs. [80] ¶ 1, [64] at 3.  ETS designs and manufactures Mirragen.  Doc. [64] at 3.  MWG is a distributor.  Id.

I.    The Distribution Agreement

In 2017, ETS and MWG established a Mirragen distributorship arrangement.  On June 12, 2017, ETS and MWG executed a Non-Disclosure Agreement (NDA), Docs. [1] ¶ 9, [15] ¶ 9, and on July 1, 2017, the parties executed a Distribution Agreement (Agreement), effective on July 20, 2017, which gave MWG the exclusive right to sell Mirragen in six states and to the entire federal government.  Docs. [80] ¶¶ 1, 3, [64-1] ¶ 1.1.  In consideration of its exclusive dealing right, MWG agreed to make an "initial minimum purchase order" of Mirragen within five days of the Agreement's execution or a

---

[1] Except as otherwise noted, the facts in this section are not subject to genuine dispute.

[2] Donnie Buck was substituted for former Defendant Ted Day, Doc. [48], after Mr. Day passed away on September 14, 2020, Doc. [47-1].  On February 4, 2022, Kimberly Day, Ted Day's widow, was substituted for Donnie Buck.  Doc. [114].

contractual "Kickoff meeting," whichever occurred later.  Docs. [1] ¶ 18, [15] ¶ 18.[3]  MWG also promised to use "best efforts to promote, demonstrate, stimulate interest in, solicit orders for and sell" Mirragen in an "end-user environment."  Doc. [64-1] ¶ 2.1.  MWG promised to keep records, make disclosure to ETS regarding product distribution, and refrain from selling Mirragen to persons or entities that were "not hospitals or appropriate medical facilities."  Id. ¶¶ 3.5, 8.7, 2.3.  The Agreement also authorized either party to terminate the Agreement without providing an opportunity to cure before completion of its contractual term if the other party committed a material, incurable breach. Id. ¶ 8.4.

II.     The July 13, 2018, Termination Letter

Toward the end of the Agreement's first one-year term, the relationship between ETS and MWG soured.  On July 13, 2018, ETS sent MWG a letter purporting to terminate the Agreement on July 20, 2018.  Docs. [80] ¶ 15, [64-5] at 1.  The Termination Letter alleged several breaches of the terms of the Agreement.  Specifically, it charged that:

(1) MWG had breached its obligation to use its "best efforts" when it was "unable to articulate the efforts made to solicit interest in the products in the territories" and represented only that it was "in 'active communication' with accounts but could not describe if such communications" merely solicited opportunities to demonstrate Mirragen.  Doc. [64-5] at 2.

(2) MWG had failed to account for product sales, "support[ing] [ETS's] belief that significant product has been warehoused or provided to non-customers," in violation of the Agreement.  Id.  ETS also asserted that it believed MWG was illicitly selling Mirragen to sub-distributors.  Id. (citing Doc. [64-1] ¶¶ 2.1, 2.11, 15.4).

(3) MWG had breached its duty of good faith and fair dealing by showing a "lack of diligence and slacking off and a willful rendering of imperfect performance," and by "warehous[ing]" Mirragen and entering into sales with "non-customers."  Id. at 3 (citing Doc. [64-1] ¶ 2.1).

(4) Because MWG had warehoused product and sold it to non-customers, it had failed to satisfy the Sales Metrics for the territories.  Id. (citing Doc. [64-1] ¶ 7.2).

---

[3] The parties do not dispute that MWG satisfied the "initial minimum purchase order" obligation.  Docs. [15] ¶ 31, [31] ¶ 35.

2

III.   July 20, 2018, to Present Lawsuit

     After the Termination Letter's effective date passed and attempts to renegotiate failed, Docs. [64] at 4, [64-4] at 295:11-15, ETS entered into contracts with alternative distributors to sell Mirragen in MWG's exclusive territories while MWG continued to sell Mirragen, Docs. [64] at 4-5, [64-6] ¶ 2. On March 8, 2019, MWG filed suit against ETS and brought the following claims:

       Count I: Declaratory Judgment

       Count II: Breach of Contract (Distribution Agreement)

       Count III: Breach of Contract (NDA)

       Count IV: Recoupment

       Count V: Theft of Trade Secrets under Federal Law

       Count VI: Theft of Trade Secrets under State Law

       Count VII: Tortious Interference

Doc. [1] at 15-26.  In Count I, MWG seeks a judicial declaration that the Agreement and NDA remained in full force and effect since execution.  Id. ¶ 75.  Count II asserts a breach of contract claim under the Agreement under the theories that ETS (i) wrongfully terminated the Agreement, (ii) illicitly granted other distributors the right to sell Mirragen in the exclusive territories, (iii) impermissibly used MWG's "customer list," and (iv) failed to act in good faith.  Docs. [1] ¶¶ 79, 82-83, 85, [63] ¶ 1.b.  In Counts III, V, and VI, MWG alleges that ETS breached the NDA and violated both state and federal trade secrets law by using both:  (i) research produced by MWG and the U.S. Department of Defense (DOD), and (ii) MWG's "customer list."  Docs. [1] ¶¶ 99-109, 123-42, 144-48, [63] ¶¶ 1.c, 1.e-f.  In Count IV, MWG brings a recoupment claim to recover its financial investment in the Mirragen it purchased.  Docs. [1] ¶ 115-121, [63] ¶ 1.d.  And Count VII claims that ETS tortiously interfered in MWG's business relationships with its present and potential customers when ETS communicated to those customers that MWG was no longer an authorized Mirragen distributor.  Docs. [1] ¶¶ 152-64, [63] ¶ 1.g.

     ETS filed its Answer, Doc. [15], on April 9, 2019, as well as an Amended Counterclaim and Affirmative Defenses on August 7, 2019.  Doc. [31].  In the Amended Counterclaim, ETS alleges the following:

       Count I: Breach of Contract (Distribution Agreement)

       Count II: Tortious Interference

       Count III: Declaratory Relief

       Count IV: Injunctive Relief

Docs. [31] at 7-25, [63] ¶ 2.a-d.

On March 12, 2021, ETS filed the instant Motion seeking summary judgment on the entire Complaint and Counterclaim Count III, as well as partial summary judgment on Counterclaim Count I.  Doc. [63] ¶¶ 6-12.  ETS argues that there is no genuine dispute of material fact that MWG incurably and materially breached the Distribution Agreement when it (i) failed to use "best efforts" to sell Mirragen, (ii) failed to maintain proper records and provide them to ETS, (iii) intentionally provided ETS with false sales information, and (iv) sold Mirragen to persons and entities that were "not hospitals or appropriate medical facilities."  Id. ¶¶ 4, 5.  Therefore, ETS claims that it is entitled to summary judgment on Counterclaim Count I and III, id. ¶ 6, as well as Complaint Count I, id. ¶ 4.

Because, in its view, the Agreement was validly terminated, ETS also claims judgment as a matter of law on MWG's other claims that depend upon the vitality of the Agreement after July 20, 2018.  Specifically, ETS argues that it is entitled to summary judgment on Complaint Count II concerning ETS's allegedly wrongful engagement of alternative distributors in MWG's territory and the purported termination of the Agreement.  Id. ¶¶ 6, 7.  ETS also claims that Complaint Count VII for ETS's tortious interference with MWG's business relationships must fail as a matter of law, because MWG no longer had a right to distribute Mirragen.  Id. ¶ 7.

Separately, ETS maintains that summary judgment is proper on Complaint Counts II, III, V, and VI for ETS's alleged use of MWG's "customer list" and DOD research because there is no evidence that ETS disclosed or misused the list and, even if it had, it obtained no economic benefit. Id. ¶ 9.  ETS states that summary judgment on Complaint Count IV is appropriate because recoupment is not an affirmative cause of action under Missouri law in these circumstances.  Id. ¶ 11.  Finally, and independent of any cause of action, ETS claims it is entitled to judgment as a matter of law that any damages owed to MWG are contractually restricted to the price MWG paid for its purchased Mirragen. Id. ¶ 12.

LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, either party may move for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrates the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets this burden, "the burden shifts to the nonmovant to submit evidentiary materials that 'designate

4

specific facts showing that there is a genuine issue for trial.'" *Miner v. Schrieber*, 2020 WL 3605619, at *1 (E.D. Mo. July 2, 2020) (quoting *Celotex*, 447 U.S. at 324). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In ruling on a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party." *Leonetti's Frozen Food, Inc. v. Re Mktg, Inc.*, 887 F.3d 438, 442 (8th Cir. 2018) (citation omitted). In reaching its decision, the Court should not "weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Id.* (internal quotation marks omitted).

DISCUSSION

Many of ETS's claims to summary judgment turn on whether the Agreement was validly terminated, effective July 20, 2018, by the July 13, 2018, Termination Letter. Therefore, it makes sense to begin this analysis with ETS's arguments for summary judgment on Counterclaim Counts I and III—ETS's breach of contract claim. If ETS is not entitled to judgment on those claims, neither will it be so entitled as to Complaint Counts I, II, and VII—MWG's claims for breach of contract and tortious interference against ETS.

After determining whether ETS is entitled to summary judgment with respect to the above counts, the Court will address Complaint Counts II, III, V, and VI, which relate to ETS's alleged use of MWG's customer list.[4] Next, the Court will address whether MWG's claimed damages may exceed the price it paid for Mirragen. Finally, the Court will decide upon MWG's Motion for Leave to File a Sur Reply.

I. Counterclaim Counts I and III—Whether MWG Materially and Incurably Breached the Distribution Agreement

"The essential elements of a breach of contract action include: '(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff.'" *Moore v. Armed Forces Bank, N.A.*, 534 S.W.3d 323, 327 (Mo. App. 2017) (quoting *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010)). With respect to breach, Missouri follows the rule of substantial performance. A plaintiff who receives imperfect yet substantial performance may not thereafter sue

---

[4] MWG does not contest entry of partial summary judgment as to Complaint Counts II, III, V, and VI as they relate to ETS's alleged use of MWG's DOD research, nor as to Complaint Count IV (Recoupment). Doc. [74] at 34. Because ETS provides sufficient evidence demonstrating the absence of a genuine dispute of material fact as to all of those claims, Doc. [64] at 20, the Court grants summary judgment on Count IV and partial summary judgment on Counts II, III, V, and VI.

to cancel and recoup the full value of the contract.  *Campbell v. Shaw*, 947 S.W.2d 128, 131-32 (Mo. App. 1997).  A party materially breaches when it fails to substantially perform.  *Fox Creek Constr., Inc. v. Opie's Landscaping, LLC*, 587 S.W.3d 746, 750 (Mo. App. 2019) (en banc) (quoting *Fire Sprinklers, Inc. v. Icon Contracting, Inc.*, 279 S.W.3d 230, 233 (Mo. App. 2009)).  When a defendant commits a material breach, the aggrieved plaintiff is excused from performing, may cancel the contract, and may sue for damages.  *Campbell*, 947 S.W.2d at 131.  Whether a breach is material is a question of fact to be determined after considering "the degree of hardship on the breaching party and the extent to which the aggrieved party has received the substantial benefit of the promised performance and the adequacy with which he may be compensated for partial breach by damages."  *Id.* at 131-32 (quoting *Murphy Leasing Co.*, 895 S.W.2d at 609).

ETS argues that it is entitled to judgment as a matter of law on Counterclaim Count I because MWG materially and incurably breached the Agreement by (i) failing to use "best efforts" to sell Mirragen, (ii) failing to keep and provide to ETS appropriate records regarding MWG's Mirragen sales, and (iii) selling Mirragen to persons and entities that were not "hospitals or appropriate medical facilities."  Doc. [64] at 7, 10, 13.  And on the same grounds, ETS contends that it is entitled to judgment as a matter of law on Counterclaim Count III, Complaint Count I, and Complaint Count VII, and to partial summary judgment on Complaint Count II.  Doc. [63] ¶¶ 4, 6, 7, 8.  The Court evaluates the three purported breaches of contract in turn.

A.  Whether MWG "use[d] its best efforts" to sell Mirragen is genuinely disputed.

Paragraph 2.1 of the Agreement obligates MWG to "use its best efforts to promote, demonstrate, stimulate interest in, solicit orders for and sell [Mirragen] in an end-user environment[.]"  Doc. [64-1] ¶ 2.1.  ETS argues that MWG failed to use "best efforts" to solicit interest in and sales of Mirragen, Docs. [63] ¶ 5.a, [64] at 7-8, because "[a]s of the date [it] sent the Termination Letter, MWG had sold approximately 1.61% of the Mirragen it purchased from ETS."  Doc. [64] at 8.  Of the 1.61% sold, ETS states that more than 62.8% was sold outside the exclusive territories and to non-"end-users."  *Id.*  ETS further contends that, by the date of the Termination Letter, MWG had made only one sale to the U.S. federal government and no sales in Louisiana, Tennessee, Arkansas, and Florida.  *Id.*  ETS argues that by the end of the initial Agreement period, MWG had only twelve customers[5] and, of those twelve, two were MWG's sub-distributors and one was a Saudi Arabian business engaged

---

[5] In its Memorandum in Support, ETS claims that MWG had only 10 customers as of the notice date.  In reply to MWG's response to ETS's Statement of Uncontroverted Material Facts, Doc. [80], ETS acknowledges that MWG had sold to 12 entities at the time of notice.  *Id.* ¶ 5.

in the automotive parts industry.  Id.  Lastly, ETS claims that MWG failed to respond to potential leads.  Docs. [64] at 9, [80] ¶ 7.

### 1. *ETS fails to show an absence of genuine dispute as to MWG's sales as a percentage of its purchases.*

It is unclear how ETS arrived at 1.61% as an estimate of how much of its purchased Mirragen MWG had sold by July 13, 2018.  ETS says it reached that percentage by dividing the total number of units sold by MWG (reflected in Exhibit G to ETS's Motion, Doc. [64-7]) by the total number of units MWG purchased, Doc. [80] ¶ 4, and that it determined the total amount of Mirragen purchased by MWG by adding (i) the total units sold (reflected in Exhibit G to ETS's Motion), (ii) the total number of units given away by MWG as samples (reflected in Exhibit G to ETS's Reply in Support, Doc. [74-7]), and MWG's remaining inventory (reflected in MWG's Answer to Interrogatory # 4, Doc. [64-2] ¶ 4).  Id.  Using the same sources, the Court calculates Mirragen units MWG sold as a percentage of the units it purchased as 1.65%.[6]  Regardless, ETS has failed to demonstrate that no genuine dispute exists about the ratio of MWG's sales to purchases.  ETS claims that the cited percentage reflects the total percentage of units sold as of the notice date (i.e., July 13, 2018).  Doc. [80] ¶ 4.  Yet, in performing the calculation, ETS used total number of units sold, even though many of the units are listed in the exhibit as having been sold after July 13, 2018.[7]  Id.

### 2. *ETS fails to show an absence of genuine dispute as to the percentage of sales to "end-users."*

ETS's claim that 62.8% of MWG's Mirragen sales were made to non-"end users" and purchasers outside MWG's exclusive territory is also insufficiently substantiated.  Doc. [64] at 8.  It is unclear how ETS arrived at 62.8%.[8]  Exhibit G does not define who is an "end-user" or where each purchaser resides; it identifies "all customers" that purchased Mirragen from MWG, specifying only the date of the order, the product code name, and the quantity.  See Doc. [64-7] ¶ 5.

---

[6] MWG sold 273 units of Mirragen.  Doc. [64-7] at 2-4.  MWG gave away 225 units.  Doc. [79-7] at 1-2.  And MWG retained 16,030 units.  Doc. [64-2] ¶ 4.  The sum of the units MWG sold, gave away, and retained is 16,528, and 273 divided by 16,528, rounded to the nearest hundredth of a percent, is 1.65%.

[7] Admittedly, had ETS excluded MWG's sales occurring after July 13, 2018, when making its calculation, the proportion of Mirragen purchased to Mirragen sold would be even smaller, which would arguably strengthen ETS's argument that MWG failed to use its best efforts.  The difference does not change the Court's finding that ETS failed to carry its burden.

[8] Trying to cite to MWG's Answer to Interrogatory # 5, ETS accidentally cites to Exhibit F—ETS's Supplemental Answer to MWG's First Interrogatories.  Doc. [64] at 8 (citing Doc. [64-6] (Exhibit F)).  Even if ETS had cited the proper exhibit, how ETS reached 62.8% remains unclear.  Doc. [64-7] at 2-4 (MWG's Supplemental Answer to ETS's First Interrogatories).

### 3. Whether MWG's few sales and failure to sell in four states evince a failure to employ "best efforts" is genuinely disputed.

ETS claims that, as of July 13, 2018:

"three units were sold in Oklahoma (to one of MWG's sub-distributors), six units were sold to the U.S. Department of Veterans Affairs, 97 units were sold in Texas (including three units to one of MWG's sub-distributors), and 163 units were sold in Saudi Arabia."

Doc. [80] ¶ 6 (citing Doc. [64-7] at 2-3). Neither party disputes that MWG made no sales in Louisiana, Tennessee, Arkansas, or Florida. Doc. [80] ¶ 6. ETS also complains that MWG sold Mirragen to only 12 customers as of the notice date. Doc. [80] ¶ 5.

Missouri law recognizes the validity of distribution agreements obligating a distributor to employ "best efforts" to sell a producer's goods to downstream consumers. Little Rock Surgical Co. v. Bowers, 42 S.W.2d 367, 369 (Mo App. 1931); Warren v. Ray Cnty. Coal Co., 207 S.W. 883, 885 (Mo. App. 1919) ("Defendant seems possessed of the idea that, to make the contract valid, plaintiff should have obligated himself in any event to sell the entire output of coal; but we think there may be a valid obligation to try to do a thing as well as to succeed in doing it.") (emphasis added); cf. Magruder Quarry & Co., LLC v. Briscoe, 83 S.W.3d 647, 650-51 (Mo. App. 2002). While the validity of such a provision is uncontroversial, the question of whether a party substantially performed under such an obligation is highly fact-intensive. See, e.g., LeMond Cycling, Inc. v. Trek Bicycle Corp., 2009 WL 10678239, at *8 (D. Minn. Dec. 4, 2009); Levin v. Grecian, 974 F. Supp. 2d 1114, 1123-24 (N.D. Ill. 2013); cf. Alice Blake, Inc. v. Hoffman, 620 S.W.2d 20, 22 (Mo. App. 1981). This case is no exception.

MWG cites evidence contextualizing the marketplace at the time Mirragen was developed and brought to consumers. According to MWG, ETS was caught off guard by Mirragen's quick FDA approval.[9] Ted Day, ETS's President, told Senator Roy Blunt and the Rolla Daily News during an April 2017 ETS facility visit that "our five month deal [to obtain Mirragen approval] . . . caught us by surprise. We thought it would be 12 months." Doc. [74-3] at 5. As a "start-up," ETS had never sold a medical device before Mirragen, Doc. [64-18] at 31:11-19, and by January 2017, about four months after receiving FDA approval, Mirragen had not yet hit the market. Doc. [64-9] at 22:18-23:9.

When ETS and MWG negotiated the distribution agreement in July 2017, nearly 10 months after receiving FDA approval, Mirragen still had not reached the market. Id. at 254:4-13. MWG offers

---

[9] Specifically, ETS applied to the FDA on April 15, 2016, for a "510(k) Premarket Notification" so ETS could market Mirragen as a medical device, Doc. [74] at 7 (citing [74-1] at 2), and ETS received approval on September 15, 2016, just five months after submitting its application. Id. (citing Docs. [74-1] at 1, [74-2] at 2).

evidence indicating that both ETS and MWG understood that a reimbursement code, a code which allows a medical device purchaser to bill the institutional payors such as an insurer or the federal government, Doc. [74] at 8 (citing Doc. [64-11] at 41:21-42:5), is a "vital part of the medical coding and insurance reimbursement process," and "essential for selling the product to private hospitals and medical practices[.]"  Docs. [1] ¶ 22, [15] ¶ 22.  Without a reimbursement code, "insurers generally will not pay for the product."  Docs. [1] ¶ 22, [15] ¶ 22.  Chad Lewis, ETS's former consultant and eventual CEO, testified that "within [the United States], our government as well as insurance agencies that reimburse and pay for healthcare costs—particularly in the outpatient settings—require a product code, HCPCS code or something like that[.]"  Doc. [64-9] at 50:12-18.  Lewis stated that by the time he left his role as CEO in November 2018, he was of the opinion that it would be necessary to obtain an "A code" to successfully market Mirragen in the outpatient setting.  Id. at 53:14-22.  Lewis further testified that, by that time, "the picture became clearer on what the limitations on marketing [Mirragen] for the price that our distributor said that they can sell for.  There was a conflict there.  The business model didn't make sense."  Id. at 55:12-16.

According to Lewis, MWG told ETS before entering the Agreement that a reimbursement code would "increase [MWG's] channels" for Mirragen sales.  Id. at 73:13-74:14.  Asked whether he had discussed the importance of a reimbursement code with Day or Lewis, Marc Gunderson, the sole proprietor of MWG, Doc. [64-4] at 10:16-20, testified that he had discussed the reimbursement code in "[e]very single conversation I had with Chad—and Chad knew it.  Chad knew it to where he started calling Will [Gunderson] and stopped calling me as much.  I had to insist upon him calling me and he knew the first conversation was always going to be the reimbursement code."  Doc. [64-4] at 320:23-321:6.  Asked whether he would have entered the Agreement had he been told at the onset that no reimbursement code was forthcoming, Marc testified: "[a]bsolutely not."  Id. at 321:7-14.  Lewis acknowledged that before ETS and MWG executed the Agreement, ETS represented to MWG that it would make efforts to obtain a reimbursement code for Mirragen, Doc. [64-9] at 74:25-75:8, and while ETS was never contractually obliged under the Agreement to obtain a code, the Agreement reflects this understanding.  Compare Doc. [64-1] ¶ 8.2, with id. ¶ 8.3 (providing different term-lengthening provisions for the pre-reimbursement and post-reimbursement code periods).  Marc Gunderson further confirmed that MWG expected a forthcoming code, testifying that MWG's obligation to satisfy the "minimum Annual Sales Metric" referenced in ¶ 1.3, see Doc. [64-1] ¶ 1.3, was introduced to assure that MWG purchased Mirragen from ETS to "build up stock until we got a code."  Doc. [64-4] at 194:18-195:8; see also Doc. [64-1] at 20 (defining "MIRRAGEN Minimum Sales"

as "product purchased from ETS Wound Care").  In sum, MWG presents ample evidence that a reimbursement code was important for the marketing of Mirragen, such that the failure to acquire a code would inhibit MWG's ability to sell the product.

In addition, MWG presents evidence indicating that it took considerable efforts to bring Mirragen to market.  MWG cites Marc Gunderson's testimony that MWG formed a team of about 15 employees and 10 independent representatives, Doc. [64-4] at 109:23-110:2, and opened a call center to generate both sales and leads, id. at 110:13-111:9.  According to Exhibit N,[10] MWG made 730 contacts with around 278 or so entities by July 13, 2018.[11]  Doc. [71] (Ex. N).

Whether an entity employed "best efforts" is a highly fact-specific question that has to be decided in a particularized context.  LeMond Cycling, Inc., 2009 WL 10678239, at *8 ("[D]etermining whether a party has exerted its 'best efforts' is dependent upon the factual circumstances surrounding the contractual agreement.") (quoting Martin v. Monumental Life Ins. Co., 240 F.3d 223, 233 (3d Cir. 2001)).  Given evidence that the lack of a reimbursement code impeded MWG's efforts to sell Mirragen and that MWG took appreciable efforts to bring the product to market despite that impediment, a genuine dispute remains over whether MWG's efforts were enough to satisfy its obligation to employ "best efforts."  LeMond Cycling, Inc., 2009 WL 10678239, at *8 ("[C]ompliance with a best-efforts clause is a question of fact for the jury.") (quoting Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs., 928 F.2d 299, 301 (8th Cir. 1991) (applying Minnesota law)).

### 4.  Whether MWG's failure to follow certain sales leads constitutes a failure to render "best efforts" is genuinely disputed.

Finally, ETS maintains that MWG did not use its "best efforts" because it failed to respond to various provided leads.  Doc. [64] at 9.  ETS states that on October 31, 2017, Chad Lewis sent an email to Marc, Sam, and Will Gunderson in which Lewis provided the names and addresses of nine individuals from eight hospitals or medical facilities.  Doc. [64] at 9 (citing Doc. [64-13]).  According to Lewis, the nine individuals demonstrated interest in Mirragen at the Fall Symposium on Advanced Wound Care (SAWC) conference.  Id. (citing Doc. [64-13]).  ETS claims that MWG failed to contact

---

[10] ETS filed Exhibits N, P-1, Q-1 and R-1 on a flash drive deposited with the Clerk's Office.  Docs. [65], [71].

[11] MWG claims that Exhibit N indicates that MWG contacted 1,022 individual entities, Doc. [74] at 19, but Exhibit N lists many repeated contacts with the same entities.  See Doc. [71] (Ex. N).  In reply, ETS clarifies that the Exhibit identifies around 278 different entities purportedly contacted by MWG by July 13, 2018.  Doc. [79] at 4.  Even as re-construed, Exhibit N supports the inference that MWG made efforts to bring Mirragen to market, creating a genuine dispute of material fact about whether its efforts satisfied its "best efforts" obligation.

eight of the nine individuals.  Id. (citing Doc. [71] (Ex. N)).  ETS also notes that on May 1, 2018, an ETS employee sent an email to Sam Gunderson providing the contact information of 15 individuals associated with various medical facilities that were interested in Mirragen at the Spring SAWC conference.  Id. (citing Doc. [64-14]).  In response, Gunderson emailed back, "[w]e will contact the leads within our states immediately."  Id. (citing Doc. [64-14]).  ETS maintains that MWG contacted only two of the 15 individuals.  Id. (citing Doc. [71] (Ex. N)).

MWG counters that ETS cherry-picks fewer than two-dozen sales leads with which MWG failed to follow up, while there is evidence indicating that MWG contacted no fewer than 1,022 entities in effort to sell Mirragen.  Doc. [74] at 19.  MWG references Exhibit N which purports to document over a thousand contacts MWG made with actual and potential Mirragen customers, listing the name of the actual or potential customer, the customer representative's name, the product line (i.e., Mirragen), the current step in the sales process, and additional information explaining the contact.  Doc. [71] (Ex. N).  In reply, ETS contends that while Exhibit N contains 1,023 rows, it identifies only 278 distinct entities purportedly contacted by MWG before July 13, 2018.  Doc. [79] at 4.

Evidence of MWG's efforts to contact 278 prospective Mirragen customers does create a genuine dispute as to whether MWG's failure to contact certain other prospective customers qualifies as a failure to use its "best efforts" to sell Mirragen.

B.  Whether MWG violated its recordkeeping and disclosure obligations under ¶¶ 3.5, 3.8, and 8.7 is genuinely disputed.

ETS claims that MWG's recordkeeping was deficient in two ways:  (1) MWG failed to keep the records that it was supposed to keep and provide the records it was supposed to provide, and (2) MWG misrepresented its real sales numbers.  Doc. [64] at 10-13.

In relevant part, paragraph 8.7 of the Agreement requires MWG to "keep full and proper books of account and records only relating to [Mirragen] purchases, sales, returns, warranty claims, customer complaints, regulatory matters and [MWG's] compliance with the terms of this Agreement and applicable laws, including but not limited to the Foreign Corrupt Practices Act."  Doc. [64-1] ¶ 8.7.  Paragraph 3.5 obligates MWG to retain "records . . . regarding the distribution or use of [Mirragen] by lot number" and to "make those numbers and the respective tracking information available" to ETS.  Id. ¶ 3.5.  Paragraph 3.8 prohibits MWG from "directly or indirectly mak[ing] any representation, statement or disclosure of a material fact relating to or affecting [ETS's] interests" that is "deceptive, misleading or false in its form or content."  Id. ¶ 3.8.  Paragraph 8.5.2 authorizes ETS, upon giving notice to MWG, to "terminate this Agreement prior to the expiration of the Initial Term

11

or any Renewal Term upon the occurrence and in the time frame specified of any of the following: . . . effective immediately. . . upon the making of any material misrepresentation by [MWG] to [ETS] or any customer or any potential customer of [Mirragen] or the discovery of the same by [ETS]."  Id. ¶ 8.5.2.

### 1. Whether MWG failed to keep and provide proper records under ¶¶ 3.5 and 8.7 is genuinely disputed.

According to Chad Lewis, ETS requested sales records from MWG "more than a dozen times," and MWG responded by submitting incorrect records and refusing to provide the proper ones. Doc. [64] at 10 (citing Doc. [64-9] at 278:10-279:11).  Lewis testified that ¶¶ 8.7 and 3.5 were intended to allow ETS to trace product for regulatory purposes as well as to verify Mirragen sales.  Id. (citing Doc. [64-9] at 272:20-273:17, 277:13-18).

MWG counters that the cited paragraphs do not obligate MWG to transmit sales records to ETS:  ¶ 8.7 does require MWG to retain sales records, among other things, but ¶ 3.5 does not require that the information covered in ¶ 8.7 be shared.  Doc. [74] at 19-20; compare Doc. [64-1] ¶ 8.7, with id. ¶ 3.5.  The Court agrees.  The plain language of ¶ 3.5 requires only that MWG maintain records regarding use or distribution of Mirragen "by lot number" and make such numbers and relevant "tracking information" available to ETS.  Doc. [64-1] ¶ 3.5.  It does not incorporate the records covered by ¶ 8.7.  Id.  In fact, ¶ 8.7 includes a separate mechanism by which ETS might review records covered by ¶ 8.7, including MWG's Mirragen sales records:  ETS may audit MWG's business records "related to [Mirragen] upon reasonable notice[.]"  Id. ¶ 8.7.

MWG concedes that ETS asked for records, and ETS acknowledges that MWG provided records, just the wrong ones.  Doc. [74] at 25 (quoting Doc. [64] at 10).  MWG offers the testimony of Sam Gunderson that while "lot numbers were tracked as product went out the door[,]" Doc. [74] at 25 (quoting Doc. [64-11] at 117:11-12), ETS "never requested" product information by lot number even though MWG "kept that and had it available at any point in time."  Id. (quoting Doc. [64-11] at 117:17-18).  Given the proper understanding of the Agreement and the conflicting testimony cited by the parties, there is a genuine dispute of material fact as to whether MWG failed to keep and provide proper records under ¶¶ 3.5 and 8.7.

### 2. Whether MWG misrepresented sales information in violation of ¶ 3.8 is not properly before the Court.

ETS argues that there is no genuine dispute of material fact that MWG thrice violated ¶ 3.8 by misrepresenting its sales data.  Doc. [64] at 10-12.  MWG protests that the allegation "that the sales

records MWG provided to ETS were false and therefore violated ¶ 3.8 of the Agreement" is a "brand-new allegation, never made in any pleading or correspondence before ETS filed its Motion[,]" Doc. [74] at 26, and thus it should not be considered by the Court.  Id.

On review of ETS's Counterclaim, Doc. [15], and Amended Counterclaim, Doc. [31], the Court finds that MWG is correct.  ETS did not plead that MWG breached ¶ 3.8 by transmitting incorrect sales data.  ETS alleged that MWG violated ¶ 3.8 only by allowing Dr. David Ellis, MWG's medical director, to present himself to potential customers as a medical director for ETS.[12]  Docs. [15] at 40, ¶¶ 64-67, [31] ¶¶ 64-67.  Thus, ETS seeks summary judgment for breach of ¶ 3.8 on factual grounds not pled in the operative pleading.

It is improper for a plaintiff to raise new claims at summary judgment that have not been alleged within its complaint.  While pleading under Federal Rule of Civil Procedure 8(a) requires district courts to construe complaints liberally, such "liberal" construction is "'inapplicable after discovery has commenced" because "[a]t the summary judgment stage, the proper procedure for [a] plaintiff[ ] to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).'"  WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co., 231 F. Supp. 3d 313, 317-18 (W.D. Mo. 2017), aff'd, 897 F.3d 987 (8th Cir. 2018) (quoting Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)); see also N. States Power Co. v. Fed. Transit Admin., 358 F.3d 1050, 1057 (8th Cir. 2004).  That makes sense, as the allegations in pleadings frame the scope of the dispute between the litigants.  Where discovery unveils new facts that support an alternative basis for relief, the claimant should seek to amend its operative pleading to include the additional factual allegations.  See Fed. R. Civ. P. 15(a).  By amending, the claimant gives the opposing party notice and opportunity to develop its arguments to confront a new claim.  Raising a new theory at summary judgment without prior amendment of the pleading deprives the opposing party of the fair notice that the federal pleading rules are designed to provide.  See WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co., 897 F.3d 987, 992-93 (8th Cir. 2018) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

Here, ETS's Amended Counterclaim was specific as to "the nature, bases, and grounds of [MWG's] alleged breaches of contract."  Id. at 993; see also Doc. [31] ¶¶ 16-140.  It contained no allegations that would have put MWG on notice that ETS sought to hold it liable for breach of ¶ 3.8 on account of material misrepresentations contained in MWG's submitted sales data.  Allowing such allegations to be raised for the first time on summary judgment would be especially problematic since,

---

[12] ETS does not argue for summary judgment on Count II for breach of ¶ 3.8 on those grounds.

if pled, they might have been subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements.[13]  See Fed. R. Civ. P. 9(b); cf. Allstate Indem. Co. v. Dixon, 304 F.R.D. 580, 583-84 (W.D. Mo. Feb. 12, 2015) (recognizing that Rule 9(b) applies to contract-based fraud claims as well as common law fraud claims) (quoting Hendley v. Am. Nat. Fire Ins. Co., 842 F.2d 267, 268 (11th Cir. 1988)).  ETS's counterarguments do not outweigh the fact that the Amended Counterclaim gave no notice that ETS intended to press a charge of material misrepresentation,[14] and so the Court declines to consider the unpled grounds for relief.

     C.  Whether MWG sold to entities that were not "hospitals or appropriate medical facilities" is genuinely disputed.

The Agreement authorizes MWG to "sell [Mirragen] in an end-user environment to ensure the highest quality of pre-sale and post-sale support to customers," Doc. [64-1] ¶ 2.1, provided MWG does not sell to "any person or entity other than a hospital or appropriate medical facility."  Id. ¶ 2.3. ETS claims that MWG breached those restrictions when it sold Mirragen to Life with Doctors, Elevated Marketing, and Wellness Ocean Trading.  Docs. [64] at 8, 13, [80] ¶ 11.

     *1.  Whether the Agreement authorized sales to Life with Doctors and Elevated Marketing is a question of fact for trial.*

According to ETS, as "sub-distributors," Life with Doctors and Elevated Marketing are not "hospitals or appropriate medical facilities."  Docs. [64] at 8, 13, [80] ¶ 11 (citing the distribution agreements between MWG and the two entities, Docs. [64-12], [64-19]).  MWG responds that the Agreement does not define "appropriate medical facility."  Doc. [80] ¶ 11.

Determining whether Life with Doctors and Elevated Marketing are "hospitals or appropriate medical facilities" requires construction of the Agreement.   "'The cardinal rule in contract interpretation is to ascertain the intention of the parties and to give effect to that intention.'" ATC Co., Inc. v. Myatt, 389 S.W.3d 732, 735 (Mo. App. 2013) (quoting Renco Grp., Inc. v. Certain Underwriters

---

[13] In its Memorandum in Support, ETS asserts that sales information MWG provided was "false and fraudulent."  Doc. [64] at 14.

[14] ETS argues that its properly pled allegations relating to MWG's failure to keep and provide records as well as the July 13, 2018, Termination Letter put MWG on notice of its misrepresentation claim under ¶ 3.8.  Doc. [79] at 11-12.  That is incorrect.  First, while the July 13th Letter may hint at a misrepresentation claim, it is not a pleading that circumscribes the scope of this litigation.  Second, the Amended Counterclaim's allegations concerning MWG's proffered sales data relate only to Agreement ¶¶ 8.7 and 3.5, not ¶ 3.8.  Doc. [31] ¶¶ 17-39.  Third, the Amended Counterclaim nowhere alleges that the sales information MWG supplied were false. Additionally, ETS has not shown that deposition testimony and other discovered materials taken together gave sufficient notice of its intention to proceed on its unpled misrepresentation claim.  See WireCo WorldGroup, 897 F.3d at 993 n.5 (interrogatories did not provide sufficient notice that party "intended to pursue a new ground").

at Lloyd's, 362 S.W.3d 472, 477 (Mo. App. 2012)).  Whether a contract is ambiguous is a legal question that is determined by looking at the contract as a whole and standing alone.  Id. (quoting *Klonoski v. Cardiovascular Consultants of Cape Girardeau, Inc.*, 171 S.W.3d 70, 73 (Mo. App. 2005)); *see also Teets v. Am. Fam. Mut. Ins. Co.*, 272 S.W.3d 455, 462 (Mo. App. 2008), *overruled on other grounds in Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013).  If the contract is clear and unambiguous, its meaning must be derived from the contract's plain language.  Id. (citing *Renco Grp., Inc.*, 362 S.W.3d at 477).  But a contract is ambiguous where, "in the context of the entire agreement, the disputed language 'is reasonably susceptible of more than one construction giving the words their plain and ordinary meaning as understood by a reasonable, average person.'"  Id. (quoting *Klonoski*, 171 S.W.3d at 73); *see also Rathbun v. CATO Corp.*, 93 S.W.3d 771, 778 (Mo. App. 2002) (noting that ambiguity exists where there is "duplicity, indistinctness, or uncertainty in the meaning of the words used") (citing *Bydalek v. Brines*, 29 S.W.3d 848, 854 (Mo. App. 2000)).  Once ambiguity is found, the parties' intention becomes a question of fact to be resolved by the trier of fact, and extrinsic evidence may be introduced.  *Myatt*, 389 S.W.3d at 735 (citing *Teets*, 272 S.W.3d at 462).

The Agreement prescribes that MWG will use its best efforts to solicit and make Mirragen sales in an "end-user environment to ensure highest quality of pre-sale and post-sale support to customers," Doc. [64-1] ¶ 2.1, and it prohibits MWG from selling Mirragen to "any person or entity other than a hospital or appropriate medical facility."  Id. ¶ 2.3.  The Agreement does not define "hospital."  More importantly, it does not define "medical facility," nor what constitutes an "appropriate" one.  The Agreement also does not define "end-user environment."[15]

The term "medical facility" is susceptible to more than one interpretation.  As a composite term, it has been defined as "a place where sick or injured people are given care or treatment (as a hospital, urgent care, or a clinic)."  *Medical facility*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/medical%20facility (last visited Feb. 14, 2022).  That is the interpretation advanced by ETS, which cites Chad Lewis's testimony that the terms "hospital" and "appropriate medical facility" mean "a facility that provides medical care."  Docs. [64] at 13, [64-9] at 266:11-267:3. Lewis also testified that ¶ 2.3 was included in the Agreement to exclude sub-distributors and thereby protect ETS's control over Mirragen, as well as its messaging, training, and patient care.  Doc. [64-9] at 267:4-18.

---

[15] The Agreement makes only one other reference to an "end-user" in ¶ 7.11, which notes MWG's obligation to notify "end-user customers" of their obligations to report discounts to government payors.

That is not the only reasonable way to interpret "medical facility," however.  The term "medical" means "of, relating to, or concerned with physicians or the practice of medicine," *Medical*, MERRIAM-WEBSTER.COM, https:/ / www.merriam-webster.com/ dictionary/ medical (last visited Feb. 14, 2022), and "facility" means "something (such as a hospital) that is built, installed, or established to serve a particular purpose."   *Facility*, MERRIAM-WEBSTER.COM, https:/ / www.merriam-webster.com/ dictionary/ facilities (last visited Feb. 14, 2022).  Taking those definitions together, "medical facility" could include any institution or business established to serve a purpose related to or concerned with the practice of medicine.  Using that broader definition of "medical facility," the Agreement authorized the sale of Mirragen to any institution that is engaged in activities related to the practice of medicine, so long as, per ¶ 2.1, it was sold "in an end-user environment."

MWG's understanding of "appropriate medical facility" aligns with the broader construction.  Marc Gunderson testified that at the time of negotiation, he understood it to include any purchasers who would place product in "any probable position of sale to end up in the end user's hand."  Doc. [80] ¶ 11 (quoting Doc. [64-4] at 135:8-22).  According to Gunderson, Life with Doctors was engaged in "home care," while Elevated Marketing sold Mirragen "hospital to hospital."  *Id.* (citing Doc. [64-4] at 253:12-15, 254:25-255:7).  He claims to have understood both as "appropriate medical facilities" under the Agreement.  Doc. [64-4] at 135:1-22.

The Agreement clearly contemplates that MWG will sell to entities that are not literal "end-users" of Mirragen—i.e., patients with unhealed wounds.  *See* Doc. [64-1] at 2.1; *see also End user*, MERRIAM-WEBSTER.COM, https:/ / www.merriam-webster.com/ dictionary/ end%20user (last visited Feb. 14, 2022) (defining "end user" as "the ultimate consumer of a finished product").  The disputed question, then, is how many steps removed an MWG customer may be from ultimate Mirragen users before the sale violates ¶ 2.3.  The Agreement itself does not resolve that question.  Because the term "appropriate medical facility" is undefined and reasonably susceptible to differing constructions, it is ambiguous, and its scope is a question of fact to be resolved at trial.  *See Myatt*, 389 S.W.3d at 735.

### 2.   *Whether MWG's sales to Wellness Ocean Trading Company in Saudi Arabia breached the Agreement is genuinely disputed.*

ETS claims that MWG incurably breached ¶ 2.3 by negotiating and selling Mirragen to "Wellness Ocean Trading, a Saudi Arabian company primarily involved in the business of automobile parts."  Docs. [64] at 13, [80] ¶ 11.  According to ETS, Wellness Ocean Trading was neither a hospital nor an appropriate medical facility and existed outside MWG's exclusive territory.  Doc. [64] at 14.  MWG responds that MWG's business activities in the Middle East were expressly authorized by Chad

Lewis, ETS's CEO.  Doc. [74] at 20.  In support of its position, MWG refers to a December 19, 2017, email from Lewis to Marc Gunderson noting a "resulting action item" that ETS draft an amendment to the Agreement "after reviewing Saudi Arabia regulatory requirements" and that further invited MWG to "share information relating to Saudi Arabia regulatory registration and the process."  Doc. [74] at 20 (citing Doc. [74-8] at 2).  On January 9, 2018, MWG responded to ETS's request by sending an email containing information about both the Alassaf family business venture and the Food and Drug Authority of the Kingdom of Saudi Arabia.  Doc. [74-9] at 2, 4-5.  Marc Gunderson testified that Lewis told him to "[m]ake the sales and I'll send you the agreement."  Doc. [64-4] at 251:13-20, 253:1-7.  Gunderson also testified that he and five others at MWG took a two-week trip to Saudi Arabia in April 2018 to solicit Mirragen sales, receiving "large purchase orders" from "[e]very [government-owned] hospital in Saudi Arabia," as well as "three private" hospitals.  Doc. [64-4] at 228:1-229:17.  According to MWG, ETS noted in its April 2018 board of directors' slide deck that ETS anticipated considerable sales in Saudi Arabia estimated at a total of $600,000 through "Atlas" (i.e., MWG).  Doc. [74] at 21 (citing Doc. [74-11] at 14).  In reply, ETS notes that ¶ 15.2 of the Agreement provides in part that "[n]o changes or modifications of or additions to this Agreement shall be valid unless the same shall be in writing and signed by each Party thereto."  Doc. [79] at 13 (quoting Doc. [64-1] ¶ 15.2).  While the proposed amendment authorizing MWG's business activity in Saudi Arabia was drafted in January 2018, ETS argues, it was never executed, and so MWG cannot rely upon Lewis' authorization.  Doc. [79] at 13 (citing Doc. [64-4] at 251:24-252:23).

It is well-settled under Missouri law that "'[a]n express provision in a written contract that no rescission or variation shall be valid unless it too is in writing is ineffective to invalidate a subsequent oral agreement to the contrary.'"  *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 535 (Mo. App. 2011) (quoting *Fritts v. Cloud Oak Flooring*, 478 S.W.2d 8, 14 (Mo. App. 1972) (quoting 3A CORBIN ON CONTRACTS § 763)); *see also Doss v. EPIC Healthcare Mgmt. Co.*, 901 S.W.2d 216, 211 (Mo. App. 1995); *Rufkahr Constr. Co. v. Weber*, 658 S.W.2d 489, 498 (Mo. App. 1983) (en banc).  The evidence cited by MWG provides an adequate basis to support a finding that MWG and ETS modified the Agreement to allow the former to solicit and enter Mirragen sales in Saudi Arabia with Ocean Wellness Trading Co. despite the limitations to modification imposed by ¶ 15.2.

Because there are genuine disputes of material fact as to whether MWG used "best efforts" as required by ¶ 2.1; kept and provided appropriate records to ETS as prescribed by ¶¶ 3.5 and 8.7; and sold only to entities that were "hospitals and appropriate medical facilities" as dictated by ¶¶ 2.1 and 2.3, ETS is not entitled to summary judgment as to Counterclaim Counts I and III.

17

II.     Complaint Counts I, II, and VII—MWG's Claims for Breach of Contract and Tortious Interference Concerning ETS's Actions to Terminate the Agreement and Employ Alternative Distributors

ETS claims that, because the Agreement was validly terminated on July 20, 2018, it is entitled to judgment as a matter of law on Complaint Counts I, II,[16] and VII.  Doc. [64] at 14-15.  Having found that there are genuine disputes of material fact preventing summary judgment as to whether ETS validly terminated the Agreement on account of MWG's pre-July 13, 2018, breaches of contract, the Court further finds that ETS is not entitled to summary judgment on Complaint Counts I, II, and VII.

III.    Complaint Counts II, III, V and VI—MWG's Breach of Contract and Trade Secret Claims Based on ETS's Use or Disclosure of MWG's Customer List

ETS also moves for summary judgment as to all of MWG's claims that relate to ETS's alleged disclosure and misuse of MWG's "customer list."  MWG claims that ETS's use of its customer list violated the terms of both the Agreement and the NDA and both federal and state trade secret laws.  Doc. [1] ¶¶ 83, 100, 105-112, 131, 135-140, 148.  All of MWG's claims relating to the customer list rest on two factual allegations:  (1) that ETS used MWG's customer list, and (2) that ETS provided that list to third-parties.  Doc. [1] ¶¶ 83, 96, 105, 108, 135-140, 146-149.

The NDA, which the Agreement incorporated, see Doc. [64-1] ¶ 6, provides that signatories thereto "will hold in strict confidence and not disclose to any third party any Confidential Information."  Doc. [1-2] ¶ 2.  The NDA also prohibits any party receiving Confidential Information from using the same for a purpose other than a Permitted Use.  Id. ¶ 2.  The NDA broadly defines "Confidential Information" as "any and all technical and nontechnical information disclosed by [a party] to [the other party][,]" id. ¶ 1, and includes, without limitation, "trade secrets," and "proprietary confidential information . . . related to the current, future, and proposed products and services of [each party], such as information concerning research, experimental work, development, [and] . . . customer lists[.]"  Id.  The Agreement provides that, in the event of conflict, the Agreement supersedes

---

[16] ETS asserts that because the Agreement was terminated, it is entitled to summary judgment with respect to MWG's claims that ETS improperly terminated the Agreement and employed alternative distributors in the exclusive territory.  Doc. [64] at 15-16.  ETS's request for summary judgment on Count II's grounds relating to ETS's purported disclosure or use of MWG's customer list will be addressed separately.

the NDA, Doc. [64-1] ¶ 6.1, and ¶ 8.10 guarantees that the obligations of the NDA continue after the Agreement is terminated.[17]

MWG claims that, in addition to breaching both the Agreement and the NDA, ETS's treatment of its customer list violated the federal Defend Trade Secrets Act (DTSA) and the Missouri Uniform Trade Secrets Act (MUTSA). Doc. [1] ¶¶ 131, 135-140, 146, 148-149. In order to prevail on a claim under either statute, MWG must show: (i) that it held a protectable trade secret, (ii) that ETS misappropriated that secret, and (iii) damages. *CGB Diversified Servs., Inc. v. Baumgart*, 504 F. Supp. 3d 1006, 1020 (E.D. Mo. 2020). To qualify as a trade secret, the subject-matter must meet two conditions: first, that "its owner has taken reasonable measures to keep it secret," and second, that "it derives independent economic value from not being known or easily ascertainable by another person who can obtain economic value from it." *Perficient, Inc. v. Munley*, 2019 WL 4247056, at *9 (E.D. Mo. Sept. 5, 2019) (citing 18 U.S.C. § 1839(3); Mo. Rev. Stat. § 417.453(4)). "Misappropriation of trade secrets 'occurs when (1) a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means, (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent, or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent.'" *Baumgart*, 504 F. Supp. 3d at 1020 (citing *Cari*, 2016 WL 6611133, at *2).

In their summary judgment briefing, neither party questions whether the customer list qualifies as "Confidential Information" under the NDA or a protectable trade secret under the DTSA or MUTSA. Docs. [64] at 17-19, [74] at 32-34. Rather, ETS argues that it is entitled to summary judgment as to all of the claims based on the customer list for two reasons: (1) there is no evidence that ETS improperly used or disclosed the customer list, and (2) (as an alternative basis for summary judgment on the trade secret claims) even if ETS had done either, there is no evidence that it derived any economic benefit therefrom. Doc. [64] at 17-19.

Regarding disclosure of the customer list, ETS points to testimony from MWG officials disclaiming knowledge that ETS had shared the customer list, Doc. [64] at 17-18 (citing Docs. [64-4] at 238:14-21, [64-11] at 104:22-106:14). ETS's Chad Lewis also emphatically denied it. *Id.* at 18 (citing Doc. [64-9] at 83:10-13). And in fact, MWG concedes that ETS did not share the entire customer list with any third party. Doc. [80] ¶ 16.

---

[17] The parties agree that the NDA remained in force at all relevant times. Docs. [1] ¶ 12, [15] ¶ 12. The NDA states that it will terminate five (5) years after June 12, 2017, Doc. [1-2] ¶ 9, and that both MWG and ETS's obligations survive the NDA's termination. *Id.*

With respect to MWG's allegations that ETS misused the customer list, ETS contends that there is no evidence that it improperly contacted MWG's customers, citing testimony from Lewis Hall, the owner of GMM, indicating that Hall was aware of MWG's customers based on his own involvement when the Agreement was signed. Doc. [64] at 18 (citing Doc. [64-20] at 46:7-15). Some of the entities MWG identified as customers were not customers at all, ETS argues, for example Deborah Floyd and Eugene Grayfer were MWG's "sub-distributors." Doc. [64] at 18-19 (citing Doc. [64-7] ¶ 5).[18]   And another putative customer was identified to ETS independently in relation to a possible clinical study, Doc. [64] at 19 (citing Doc. [64-9] at 85:16-86:6), and never purchased Mirragen from MWG. Doc. [64-7] ¶ 5.

MWG replies with additional evidence that, it believes, indicates that ETS misused MWG's client list. Specifically, on December 6, 2018—six months after MWG disclosed its customer list identifying Hines Veterans Affairs Hospital as one of its customers—an employee of ETS emailed the operator of a prospective distributor noting that, as that prospective distributor was aware, ETS was trying to replace the product VA Hines had purchased from MWG, and encouraged him to "build a relationship" with VA Hines. Doc. [74] at 33 (citing Docs. [74-19] at 1, 15, [74-25] at 2-3). ETS claims that it had information about VA Hines before receiving MWG's customer list,[19] and that VA Hines reached out to ETS before ETS engaged the new distributor to supply the hospital. Doc. [79] at 14-15 (citing Doc. [64-9] at 255:23-256:20).

While ETS's evidence provides a plausible alternative explanation of the communication between ETS and VA Hines after ETS received MWG's customer list, it does not foreclose the possibility that ETS misused MWG's customer list. A material fact need not "be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute can be shown to require a jury or judge to resolve the parties' differing version of the truth at trial." First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). Here, each party provides substantial evidence to support its side of the story. Resolving the

---

[18] ETS claims that "Chad Lewis recalled contacting Grayfer 'to notify [him] that MWG was no longer the distributor'" without knowing whether Grayfer was a customer. Doc. [64] at 19 (citing Doc. [64-9] at 85:1-10). That Lewis was referring to Grayfer is not apparent from the cited testimony. Asked whether he remembered the "one customer" he notified, Lewis testified that he thought it was a home health organization and did not remember its name. Doc. [64-9] at 85:7-13.

[19] ETS claims that it sent MWG an email on November 2, 2017, containing Nancy Chaiken's contact information and listing Hines VA as a potential customer. Doc. [79] at 14 (citing Doc. [79-3]).

issue will require making credibility determinations about the provided evidence, which is outside the scope of summary judgment.  *Anderson*, 477 U.S. at 249.

Because the alleged misuse or disclosure of the customer list is genuinely disputed, so is the question of whether ETS realized any economic benefit therefrom:  If ETS used MWG's customer list to identify VA Hines as a potential customer, then there is evidence in the record that it realized an economic benefit from use of the list; if its relationship with VA Hines has an innocent origin, then so do those economic gains.  Thus, ETS's alternative argument for summary judgment on Complaint Counts VI and VII also fails.[20]

## IV.   Deciding Summary Judgment on MWG's Claimed Damages is Premature

ETS notes that "[i]n its Complaint, MWG seeks actual damages, punitive damages, recoupment of out-of-pocket losses no less than $2 million, and attorney's fees," and claims that because "the Agreement limits damages incurred by ETS to the amount actually paid by MWG to ETS for its purchase of Mirragen," ETS is entitled to summary judgment on "any damages that exceed" that amount.  Doc. [64] at 21-22.  Because the issue may be entirely avoided if, at trial, MWG fails to prove its case, it is unripe for a ruling at this time.  *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1039 (8th Cir. 2000) ("Judicial resolution of a legal question fit for judicial review yet portending no immediate hardship would constitute little more than a law review article.").

## V.   MWG's Motion for Leave to File a Sur Reply Is Denied As Moot

On May 14, 2021, MWG filed a Motion for Leave to File a Sur-Reply, Doc. [82], in response to arguments raised by ETS in its Reply, Doc. [79].  MWG contends that ETS neither argued in its

---

[20] ETS's argument based on lack of economic benefit fails on the basis of the factual record, and MWG does not question its legal merits, so the Court has not had the benefit of adversarial briefing on that issue. Nevertheless, it notes that the legal authority cited by ETS does not obviously support the claim that MWG must prove that ETS acquired an economic benefit to prevail on its civil trade secret causes of action. In *Proficient*, the court cites 18 U.S.C. § 1832(a) and MO. REV. STAT. § 417.455 for the proposition that the DTSA and MUTSA make it illegal to misappropriate trade secrets "for the purpose [of receiving an] economic benefit." *Proficient*, 2019 WL 4247056, at *9. MO. REV. STAT. § 417.455 authorizes injunctive relief against actual or threatened misappropriation to eliminate any commercial advantage derived from the misappropriation. 18 U.S.C. § 1832(a) defines the federal crime of trade secret theft, and the "economic benefit" language is contained in the portion of the statute defining the requisite *mens rea* for the offense. 18 U.S.C. § 1832(a) ("Whoever, with intent to convert a trade secret . . . to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—. . . ."). The federal private right of action for misappropriation of trade secrets—i.e., the right of action at issue in this lawsuit—is provided in 18 U.S.C. § 1836(b). *See Eberline Oilfield Serv., Inc. v. Eberline*, 2020 WL 6233330, at *6 (D.N.D. March 6, 2020) ("While § 1832, a criminal statute, does not itself provide a private civil cause of action, § 1836(b)(3) does provide one.").

Motion for Summary Judgment nor alleged in its Counterclaim that MWG failed to satisfy ¶ 7.9 of the Agreement. Doc. [82] ¶¶ 2, 5.

After reviewing the Counterclaim, Doc. [15], the Amended Counterclaim, Doc. [31], the Motion for Summary Judgment, Docs. [63], and the Memorandum in Support, Doc. [64], it is clear that MWG is correct.  ETS may not raise new grounds in its reply brief at summary judgment.  See F.T.C. v. Neiswonger, 580 F.3d 769, 775 (8th Cir. 2009) (noting that "'[c]laims not raised in an opening brief are deemed waived'") (quoting Jenkins v. Winter, 540 F.3d 742, 751 (8th Cir. 2008)); see also WireCo WorldGroup, Inc., 231 F. Supp. 3d at 317-18 (quoting Gilmour, 382 F.3d at 1315), aff'd, 897 F.3d 987 (8th Cir. 2018).  Therefore, the Court does not address those grounds for relief and denies MWG's Motion for Leave to File a Sur-Reply as moot.

Accordingly,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED as to Complaint Count IV and Complaint Counts II, III, V, and VI as they relate to Defendants' alleged use or disclosure of U.S. Department of Defense research.

IT IS FURTHER ORDERED that, in all other respects, Defendant's Motion for Summary Judgment (Doc. [63]) is DENIED.

IT IS FINALLY ORDERED that Plaintiff's Motion for Leave to File a Sur Reply (Doc. [82]) is DENIED as moot.

The Court will issue a separate partial judgment consistent with this Memorandum and Order.

Defendants are instructed to file Exhibits N, P-1, Q-1, and R-1 on the docket within 14 days of entry of this Order.

Dated this 18th day of February, 2022.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE